UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAN MILLER,                )
                           )
        *Plaintiff,*      )
*v.*                     )      No. 2:05-cv-035
                           )      HON. R. ALLAN EDGAR
STATE OF MICHIGAN,   )
DEPARTMENT OF NATURAL  )
RESOURCES,          )
                           )
        *Defendant.*   )

## <u>MEMORANDUM</u>

Plaintiff Jan Miller brings this employment discrimination action against defendant State of Michigan, Department of Natural Resources ("DNR") for alleged discrimination on the basis of sex and for alleged retaliation during her employment with DNR. Miller's complaint raises claims of sex discrimination based on a failure to promote, disparate treatment, harassment, retaliation, and constructive discharge under Title VII, 42 U.S.C. §§ 2000e et seq.

DNR moves for summary judgment on all of Miller's claims. [Court Doc. No. 18]. Miller has responded in opposition to DNR's motion for summary judgment. [Court Doc. No. 28]. After reviewing the record in the light most favorable to Miller, the Court concludes that DNR's motion for summary judgment will be **GRANTED**.

## I.    Background

The facts, seen in the light most favorable to the plaintiff, are as follows. Miller began her employment with the DNR in 1994 as a probationary conservation officer ("CO"). Although DNR suspended Miller during her probationary period, it extended the probationary period and

transferred her to Mackinaw County in Michigan's Upper Peninsula where she became a full-time employee.  [Court Doc. No. 19-3, Attachment ("Att.") 1, Deposition of Jan Miller ("Miller Dep.")].  On September 20, 1998, Miller's supervisor, Lieutenant Dan Polzien, issued Miller a "Notice of Formal Counseling" for disobeying an order involving issuing a ticket to a citizen. [Court Doc. No. 19-4, Att. 2].

During the first several years of Miller's employment with DNR she received evaluations indicating that her performance was satisfactory and that she met all of her goals.  [Court Doc. No. 28-2, Affidavit of Jan Miller ("Miller Aff."), ¶ 1].  Things began to go awry when Polzien met with  Miller on November 2, 2000 to discuss another formal counseling notice with her.  At that meeting Polzien was prepared to issue Miller a written counseling notice for her untimely report of a work-related accident.  Miller Dep. pp. 114-15.  Miller contends that she did not know that it was a violation of DNR policy to report accidents late until her meeting with Polzien.  *Id.* Before November of 2000, Miller had never informed Polzien that she felt that he discriminated against her on the basis of her gender.  *Id.* at 117.  Miller asserts that Polzien admitted to her in the November 2000 meeting that other male officers had turned in late paperwork, but had not received letters "in their file" for turning the paperwork in late.  *Id.* at 117-18.  Miller informed Polzien that she believed his action discriminated against her on the basis of her gender.

During this meeting, Miller informed Polzien that she believed he had engaged in other forms of discrimination against her at various times.  She then discussed a lengthy list of allegedly discriminatory actions that she felt she had suffered over the years from Polzien.  She informed Lt. Polzien that his comment  that "women shouldn't be in law enforcement because they make men have affairs" made sometime between 1995 and 1997 was discriminatory.  *Id.* at

118.  Miller admits that while she was married, she had an affair with a CO during her

employment at DNR.  Miller Dep., pp. 145, 263.  Miller described other instances of allegedly

disparate treatment, including Polzien's rule forbidding her from traveling outside of her

administrative area when similar male officers traveled outside of their areas.  *Id.* at 118-19.  She

also mentioned that she did not appreciate a comment that Polzien made around 1997 that

another woman employee had "ruined the duck camp for the other officers because they couldn't

be naked in the sauna."  *Id.* at 120.  She essentially felt that she "was being held to a different

standard" from the men in her department.  *Id.* at 122.  She admits that Polzien never informed

her that he treated her differently because of her gender.  *Id.* at 123.

 After their discussion Polzien destroyed the counseling notice, and Miller believed that

she and Polzien had reached an "understanding."  Miller Dep., pp. 124-25.  Miller did not file a

complaint against Lt. Polzien at that time.  *Id.*

 In June 2002 Polzien met with Miller to discuss another formal counseling notice

regarding an untimely accident report.  Miller Dep., p. 138.  Miller had experienced soreness

after a training exercise at work, but she did not know if she was injured.  *Id.*  When the soreness

did not abate, she called a supervisor, Sergeant Cischke about the issue.  He recommended that

she file an accident report, and she did so promptly after his suggestion.  *Id.*  Miller explained to

Polzien that she did not file the report immediately because she was not sure that she was injured.

*Id.*  However, Polzien still issued the written notice of counseling.  *Id.* at 140.  The notice

indicated that Miller participated in training on April 22, 2002 and that she informed Sgt.

Cischke of the injury on April 23.  However, she did not file an injury report until May 21, 2002.

[Court Doc. No. 19-4, Att. 3].  The notice also indicates that the "patrol planner," a type of

handbook for COs, required employees to report accidents within 24 hours. *Id.* It further notes that Miller received counseling regarding this issue on November 29, 2000 and notes that DNR could be fined $1000 for a late notification to the Accident Fund Company. *Id.*

Miller filed an internal grievance with DNR and a charge with the Equal Employment Opportunity Commission ("EEOC") following her discussion with Polzien in June 2002. The internal grievance lists twenty-four separate incidents of alleged mistreatment or discrimination. [Court Doc. No. 19-6, Att. 4]. Many of the instances alleged are allegations that Miller reported to Polzien in November 2000. They include grievances relating to several different general categories: insensitive comments relating to women; disparate treatment of Ms. Miller from her male co-workers; improper discipline or application of work rules and unfair performance appraisal issues; and general insensitivity to Ms. Miller.

The comments pertaining to women include the two comments Miller informed Polzien about in the November 2000 meeting, as well as a question Polzien posed to her following her complaint that her new holster hurt her hip. [Court Doc. No. 19-6, Att. 4]. Polzien allegedly asked her if the holster hurt her because she is a woman. *Id.* Miller also complained that her male co-workers were generally treated better in several ways, including: Polzien told Miller not to leave her assigned area, although her male co-workers were allowed to leave their areas; Polzien did not allow Miller to participate in Beaver Island commercial and tribal fish patrols because they were out of her area even though her male co-workers were allowed to participate in such patrols outside of their areas; Miller was not allowed to spend as much money on her new snowmobile as her male co-workers; Polzien disciplined Miller for filing untimely accident reports, although her male co-workers were not disciplined for doing the same thing. *Id.*

-4-

Miller also alleged that Polzien was generally insensitive to her on several occasions. [Court Doc. No. 19-6].  Miller further asserted that Lt. Polzien provided inaccurate appraisals and that Polzien unfairly disciplined her for failing to follow an order from Polzien that conflicted with what local law enforcement officers told her to do.  [Court Doc. No. 19-6].  She further alleges that she was unfairly disciplined for filing untimely accident reports and for ticketing a citizen inappropriately.  *Id.*  She also asserted that she did not receive overtime pay for an incident involving restraining a wolf hybrid.  *Id.*

Many of the alleged incidents are not dated, and they span several years, stretching from the early 1990s until Miller filed the grievance in 2002.  Miller filed her EEOC charge on June 29, 2002, alleging sex discrimination and retaliation in terms of discipline and for "Harassment/Not Sexual."  [Court Doc. No. 19-7, Att. 5].

A personnel management specialist with DNR, Irma Davaloz, investigated Miller's grievance.  [Court Doc. Nos. 19-8, 28-3, Deposition of Irma Davaloz ("Davaloz Dep."), p. 7, 11-12, 24].  Davaloz issued a report describing her investigation and declined specifically to address the merits of each of Miller's complaints, except to say that Polzien denied the majority of them. [Court Doc. No. 19-9].

The report further criticized Miller's work performance.  It asserted that Miller "tends to stick to a narrow patrol area" and "does not like to be supervised."  [Court Doc. No. 19-9].  The report also alleged that Miller's male co-workers "do not want to work with Officer Miller because she makes inappropriate sexual comments and they fear she will make allegations against them."  *Id.*  Ms. Davaloz' report also states that "Captain Bacon said that [Miller] is attractive and seems to use her femininity and sexuality to manipulate males.  However, that

approach will not work with her current supervisors." *Id.* The report concluded that Lt. Polzien's and Sgt. Cischke's expectations were reasonable and that these expectations did not constitute harassment or a hostile work environment. *Id.*

Following the filing of her first EEOC charge, Miller asserts that DNR began to retaliate against her. During another survival training Miller presented a note from her doctor indicating that she could not participate in the "break falling" exercise due to an injury. Miller Aff., ¶ 3. She alleges that although that particular training did not include a "break falling" exercise, DNR required her to take sick leave and then have a doctor complete a form regarding her mental and physical fitness to return to work. *Id.* Miller alleges that this was not the protocol in many other routine sick leave situations. [Court Doc. No. 28-6].

On September 30, 2002 Miller received her first "needs improvement" rating on a performance appraisal in the category of "self-management," which included the areas of displaying initiative, commitment towards completing assignments in a timely manner, working with minimal supervision, and demonstrating responsible behavior. Miller Aff., ¶ 4; [Court Doc. No. 28-7]. Miller received information indicating that she received that rating due to her filing of untimely accident reports. Miller Aff., ¶ 4.

Miller also alleges that Polzien criticized her for reporting headaches suffered on the job because headaches were not reportable injuries. Miller Aff., ¶ 4. Miller further asserts that Lt. Polzien "passed her over" for a Field Training Officer position and other "special positions" awarded to other COs with less seniority or without objectively better qualifications. *Id.*

On March 31, 2003 Miller filed her second EEOC charge alleging retaliation since the filing of her first EEOC charge. [Court Doc. No. 19-10]. In her charge, Miller alleged:

> Since filing my first complaint, I have been subjected to unequal terms and
> conditions of employment.  I was informed that I needed to improve my
> performance related to paperwork violations, while another man coworker was not
> told to improve his performance for the same type of paperwork violations.  I was
> required to take sick leave and submit a 'fitness for duty' certification when
> similarly situated men employees were not required to do so.  I have been verbally
> counseled for allegedly being unproductive, while men conservation officers in
> similar situations were not counseled.

*Id.*

On September 15, 2003 a Michigan State Police car passed an area where Miller was

attending to an issue along the road, and Miller believed the police officer made an obscene

gesture towards her.  Miller Aff., ¶ 5.  Miller believed that a particular officer made the gesture

because of her "history" with that officer.  *Id.*  Miller contacted the police officer's post and

inquired about who was on duty at the relevant time.  *Id.*  When she discovered the officer she

suspected had been on duty, she called the officer's supervisor, Lt. David Hopper, to report the

incident.  *Id.* [Court Doc. No. 19-11, Affidavit of F/Lt. David B. Hopper ("Hopper Aff."), ¶ 4].

Lt. Hopper knew that Miller's allegation was false because the suspected officer had been at the

post where Lt. Hopper was at the time of the alleged incident.  Hopper Aff., ¶ 5.  Lt. Hopper

asserts that Miller's conduct was very unprofessional and:

> was conduct unbecoming a state employee and discredited the reputation of the
> DNR.  Her actions created ill feelings and mistrust with me and other individuals
> in the MSP Newberry Post, and, in my opinion, her continued presence in the area
> would have negatively impacted the ability of this office to work effectively with
> DNR, specifically in the area of back up and the sharing of information necessary
> in law enforcement work.

*Id.* at ¶¶ 3, 6.  On September 23, 2003 Lt. Hopper wrote a letter to Lt. Polzien regarding the

incident, and he was unaware at the time of Miller's complaints of gender discrimination.  *Id.* at

¶ 7.  Polzien conducted an investigation into the situation and determined that Miller had made a

false complaint against the police officer. [Court Doc. No. 19-12]. Polzien retired shortly thereafter and was not involved in any disciplinary decision regarding the incident. [Court Doc. 19-12, Deposition of Danny Polzien ("Polzien Dep."), p. 59].

In early October 2003, an employee at the Naubinway Field Office, Cheryl Ozanich, contacted Sgt. Cischke to discuss conflicts that staff members were having with Miller. [Court Doc. No. 19-14, Deposition of John Cischke ("Cischke Dep."), p. 80]. Cischke then attended a meeting on October 16th with the staff to discuss their concerns. *Id.* at 81. The staff members related various concerns regarding Miller, including that she had stated that one employee's wife was fat; that she called many local citizens and hunters "dirt bags"; that she made inappropriate comments with sexual overtones to one employee that made him feel uncomfortable; that she spoke to one wildlife division employee only by swearing at the employee; that staff members did not feel comfortable contacting her with work-related complaints because Miller did not answer their calls or provided various reasons for why she could not respond to the complaints. *Id.* at pp. 83-85.

Lt. Courchaine, another supervisor at DNR, conducted an investigation into the allegations. [Court Doc. No. 19-15, Deposition of Thomas Courchaine ("Courchaine Dep.") p. 52]. Courchaine's investigation revealed the same allegations against Miller as Cischke's meeting did, except that he also noted an allegation of inappropriate use of State equipment. [Court Doc. No. 19-16]. Courchaine concluded in his investigation report that Miller's behavior violated two relevant work-related policies, as well as several DNR work rules pertaining to courteous treatment of co-workers. *Id.* The investigation report notes that "[a]ll employees but one stated that their working relationship with [Miller] has deteriorated and has gotten worse in

-8-

the last two years." *Id.* The report details Miller's inappropriate comments about the public, unwillingness to be available to respond to staff calls, discourteous treatment of a wildlife employee, inappropriate sexual comments, and use of her patrol truck for personal purposes. *Id.* The employees did not have dates for the events, but stated that they had occurred "over the last 4 or 5 years." *Id.* DNR also submits deposition testimony by several of the Naubinway staff members expressing their concerns about Miller's work performance. [Court Doc. Nos. 19-24, Deposition of Charles Vallier, p. 8; 19-25, Deposition of Cheryl Ozanich, pp. 8-9; 19-26, Deposition of Karen Rodock, pp. 6-12; 19-27, Deposition of Amy Douglass, pp. 7-12; 19-28, Deposition of Robert Aldrich, p. 7].

Miller asserts that although Courchaine interviewed her about the alleged incidents, he did not advise her of the specific allegations against her or of the individuals making the allegations. Miller Aff., ¶ 6. He also failed to give her the opportunity to ask questions about the specific allegations or report her version of events in full. *Id.*

In January of 2004, Miller applied for an open sergeant position at DNR. [Court Doc. No. 19-17, Affidavit of Sally A. Thomas ("Thomas Aff."), ¶ 3]. DNR's interview panel recommended that David Rantanen receive the position. *Id.* at ¶ 4. Ms. Thomas, a member of the interview panel, testifies in her affidavit of the panel's belief that Rantanen "was more qualified for the position than [Miller] and performed better than [Miller] during the interview process." *Id.* Ms. Thomas also asserts that Miller's gender and her complaints of gender discrimination played no role in the decision. *Id.* at ¶¶ 6-7. In the letter Ms. Thomas wrote to the Human Resources department describing the reasons for recommending Rantanen for the position, she asserts that Rantanen possessed good skills in the areas of leadership,

-9-

communication, knowledge of programs, and team building-conflict resolution.  Thomas Aff.,

Att.  The letter also states that "Ms. Miller is currently not an acceptable candidate.  During her

interview she was unable to demonstrate the skills and abilities necessary to fulfill the

responsibilities of this position."  *Id.*

       In early 2004 a DNR management team, that did not include Polzien, who had retired,

met to discuss Miller's false allegation against the state police officer and the situation with the

Naubinway staff.  [Court Doc. No. 19-18, Deposition of Captain Curt Bacon ("Bacon Dep."), pp.

24-27].  On March 9, 2004 the management team issued a five-day suspension to Miller based on

the false allegation against the state police officer due to its finding that she violated Law

Enforcement Division Policy 3-2-22(3) "by conducting [herself] in a manner that does damage or

bring the public image, integrity or reputation of the Michigan Department of Natural Resources

or the Law Enforcement Division into discredit or disrepute."  [Court Doc. No. 19-19].  In a

letter dated March 8, 2004 DNR also reassigned Miller to another district effective in April in

accordance with the terms of the applicable collective bargaining agreement.  [Court Doc. No.

19-20].  The letter sent to Miller from Courchaine specifies the reasons for the transfer:

> This determination is made based on the following observations:
> • You filed a false complaint against a Michigan State Police Trooper that works
> out of a Post and District that covers your work area, creating ill feelings and
> mistrust with the law enforcement agency you and the rest of your area relies on
> for back up and the sharing of information necessary in law enforcement work.
> • Your working relationship with the Naubinway DNR Staff has deteriorated to
> the point that there is no working effective relationship that allows for mutual and
> free exchange of information and level of interaction necessary to carry out the
> mission of the Department and Divisions.  Your failure to maintain good working
> relationships with the Naubinway office staff obstructs the team approach
> necessary for effective law enforcement.

[Court Doc. No. 19-20]. The collective bargaining agreement provides that DNR may reassign an employee "when an employee's conduct or actions have been such that the employee's continued presence in a work site will be detrimental to the continued effectiveness of the work unit or, the employee will be seriously hampered in the effective performance of the employee's duties." *Id.*

Miller asserts that one of the members of the decision-making team, Captain Bacon, was biased against women because he believed they are manipulative and was biased against Miller because he believed that she is "attractive and seems to use her femininity and sexuality to manipulate males." Bacon Dep., p. 11-12; [Court Doc. No. 28-5]. In his deposition, Bacon testified that "I think [Miller's] a manipulative person, whether it be males, females or anybody. I think she's a very manipulative person." Bacon Dep., p. 11.

Miller took leave from her employment in January of 2004, and she returned for a brief period. Miller Aff., ¶ 7. Upon her return she received a performance evaluation with an overall rating of "Needs Improvement" and specific "Needs Improvement" ratings in the areas of flexibility and adaptability; integrity/honesty; interpersonal skills; self-management; and team work. [Court Doc. No. 28-15]. Following her receipt of this evaluation, Miller again took a medical leave of absence and has not returned to DNR since that time. Miller Dep., pp. 8-9; Miller Aff., ¶ 7. DNR replaced Miller with another woman. [Court Doc. No. 19-21, Affidavit of Kellie A. Nightlinger ("Nightlinger Aff."), ¶ 3].

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is

on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary

judgment.  *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51

F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

## III.   Analysis

### A.   Statute of Limitations

Although neither party raises the issue of statute of limitations, the Court finds that some

of Miller's claims are barred by the statute of limitations under Title VII.  Title VII requires a

plaintiff to file a charge of discrimination within 300 days of the alleged discriminatory practice

if the charge is filed in a state that has its own employment discrimination laws, otherwise known

as a deferral state.  42 U.S.C. § 2000e-5(e).  Michigan is a deferral state.  *See Waller v. Daimler*

*Chrysler Corp.*, 391 F.Supp.2d 594, 599 (E.D. Mich. 2005) (citing *Campau v. Orchard Hills*

*Psychiatric Ctr.*, 946 F.Supp. 507, 510 (E.D. Mich. 1996)).

Under Title VII, "when an employee believes that he or she has been subjected to

discrimination, the statute of limitations begins to run from the date the employee knew or should

have known the act of discrimination occurred."  *Page v. Metropolitan Sewer District of*

*Louisville*, 84 Fed. Appx. 583, 585  (6th Cir. 2003) (citing *Janikowski v. Bendix Corp.*, 823 F.2d

945, 948 (6th Cir. 1987)).   Under certain circumstances a plaintiff may allege a continuing

violation under Title VII.  A plaintiff "'alleging a continuing violation of Title VII may file

charges with the EEOC at any time during which the alleged continuing violation has taken

place.'"  *McCormick v. Farrar*, 147 Fed.Appx. 716, 720 (10th Cir. 2005) (quoting *Rich v. Martin*

*Marietta*, 522 F.2d 333, 348 n.15 (10th Cir. 1975)).  However, the U.S. Supreme Court has made

clear that the continuing violation doctrine does not apply to discrete employment actions:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal
> to hire are easy to identify.  Each incident of discrimination and each retaliatory
> adverse employment decision constitutes a separate actionable 'unlawful
> employment practice.' [Plaintiff] can only file a charge to cover discrete acts that
> 'occurred' within the appropriate time period.  While [the plaintiff] alleged that he
> suffered from numerous discriminatory and retaliatory acts from the date that he
> was hired through March 3, 1995, the date that he was fired, only incidents that
> took place within the timely filing period are actionable.

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061 (2002).

To the extent that Miller is claiming disparate treatment discrimination for Polzien's

discrete acts prior to 300-days before her first EEOC charge dated June 29, 2002, such claims are

barred by Title VII's statute of limitations.  This includes all of the alleged discriminatory acts

with which Miller confronted Polzien in their November 2000 meeting.

### B.        Hostile Environment Harassment Claim

Miller's complaint is less than clear about the claims she wishes to raise, but it does

allege that she was subjected to a "hostile work environment," presumably on the basis of her

sex.  [Court Doc. 1-1].  However, Miller fails to brief the issue of hostile work environment in

her opposition to the DNR's summary judgment motion.  Miller's harassment claim based on

Polzien's behavior is not time-barred if one incident of alleged harassment occurred during the

filing period.  *See National R.R. Passenger Corp.*, 536 U.S. at 117-18, 122 S.Ct. at 2075.

To establish a prima facie case of a hostile work environment on the basis of sex, a

plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she was subjected to

unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment

created a hostile work environment, and that (5) the employer is vicariously liable."  *Clark v.*

*United Parcel Service*, 400 F.3d 341 (6th Cir. 2005) (citing *Williams v. General Motors Corp.*,

187 F.3d 553, 560 (6th Cir. 1999)). In addition, " 'for sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004) (quoting *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000)). Courts must review the totality of the circumstances when analyzing whether a hostile environment existed. *Id.* Factors to consider include " 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Valentine-Johnson*, 386 F.3d at 814 (quoting *Burnett*, 203 F.3d at 982). The U.S. Supreme Court has determined that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Although some courts have found that "conduct which 'ridicules women or treats them as inferior' can constitute gender harassment," the "plaintiff must prove that her sex or gender was the underlying reason for the alleged harassment she suffered." *Pierri v. Cingular Wireless, LLC*, 397 F.Supp.2d 1364, 1377 (N.D. Ga. 2005) (quoting *Sims v. Montgomery Cty. Comm.*, 766 F.Supp. 1052, 1073 (M.D. Ala. 1991) (citing *Succar v. Dade Cty. Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000)).

To the extent that Miller attempts to present a hostile environment harassment claim, none of the behavior in which Miller alleges Polzien engaged rises to the level of severity and pervasiveness required to establish a hostile environment sexual or gender harassment claim. The Sixth Circuit has refused to find a hostile environment harassment claim under circumstances far worse than the ones Miller faced from Polzien spread over the course of

several years.  *See Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 790 (6ᵗʰ Cir. 2000);

*Burnett*, 203 F.3d at 985; *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6ᵗʰ Cir. 1997).

Therefore, this Court will dismiss Miller's hostile environment harassment claim.

###    C.    Disparate Treatment and Failure to Promote Claims

Liability under Title VII will depend on whether the protected trait of sex " 'actually

motivated the employer's decision.' "  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing *Hazen Paper Co. v. Biggins*, 507 U.S.

604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).  The Supreme Court has " 'established an

allocation of the burden of production and an order for the presentation of proof in . . .

discriminatory-treatment cases.' "  *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Center v.

Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *McDonnell Douglas Corp.

v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  The plaintiff must initially

demonstrate a prima facie case of discrimination.  *Reeves*, 530 U.S. at 142.  The plaintiff may

establish a prima facie case "by presenting direct evidence of intentional discrimination by the

defendant, or by showing the existence of circumstantial evidence which creates an inference of

discrimination."  *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6ᵗʰ Cir. 1995)

(citations omitted).

In defining direct evidence the Sixth Circuit has determined that "[i]n discrimination

cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful

discrimination was at least a motivating factor in the employer's actions."  *Laderach v. U-Haul

of Northwestern Ohio*, 207 F.3d 825, 829 (6ᵗʰ Cir. 2000); *see also, Kocak v. Community Health

Partners of Ohio, Inc.*, 400 F.3d 466, 471 (6ᵗʰ Cir. 2005) (noting that direct evidence is evidence

that "compel[s] a reasonable factfinder to conclude that [plaintiff] was not hired for discriminatory reasons").  Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Products*, 176 F.3d 921, 926 (6th Cir. 1999) (citing *Talley*, 61 F.3d at 1248).

Miller alleges that she has direct evidence of discrimination due to comments by Captain Bacon that women are manipulative and that Miller is manipulative.  Capt. Bacon was a member of the team that decided to transfer Miller and discipline her for the Michigan State Police incident.  Miller asserts that Captain Bacon's comments about her being manipulative and about women being manipulative constitutes direct evidence of an intent by DNR to discriminate against her on the basis of her sex.  This Court disagrees.  First, Captain Bacon was only one member of a multi-member management team that decided to transfer Miller.  Second, although Captain Bacon's comments may unfairly stereotype women, they are not direct evidence that he intended to discriminate against Miller by transferring or suspending her based on her sex.  To determine that Bacon's comments motivated Miller's transfer, one must make several inferences.  One must infer that Bacon's belief that women are manipulative and his belief that Miller is manipulative led him to believe that Miller must be transferred and enabled him to convince the rest of the management committee of the need to transfer Miller.  This string of events is too attenuated to constitute direct evidence of sex discrimination.  *See Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 276 (6th Cir. 2003) (principal's comment that plaintiff was "too macho" did not constitute direct evidence of discrimination).  Similar to what the Sixth Circuit found in *Lautermilch*, this Court finds that Bacon's comment was more critical of Miller's specific

behavior than of her sex or gender. *Id.* Thus, Miller must demonstrate her prima facie case based on indirect evidence.

When a plaintiff chooses to establish a prima facie case of discrimination using circumstantial evidence, the plaintiff must demonstrate: (1) membership in the protected group; (2) qualification for the position; (3) an adverse employment decision; and (4) replacement by a person outside the protected class or different treatment from similarly situated non-protected employees. *See Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)(citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

Once the plaintiff articulates a prima facie case of discrimination, the burden shifts to the defendant to demonstrate that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Reeves*, 530 U.S. at 142. Once the defendant makes such a showing, the *McDonnell Douglas* framework disappears and discrimination remains the sole issue. *Id.* at 143. At that point the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The Sixth Circuit has determined that:

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.

*Peters v. Lincoln Electric Co.*, 285 F.3d 456, 471 (6th Cir. 2002) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The burden of persuasion always

remains with the plaintiff. *McGinnis*, 266 F.Supp.2d at 760 (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Miller asserts that, even if she has not shown direct evidence of sex discrimination, she has demonstrated a prima facie case of disparate treatment discrimination. The parties do not dispute that Miller is a woman, a member of the protected class, and that Miller was qualified for the CO position she held. Miller asserts that she was subject to the adverse employment actions of a transfer to another district and the cumulatively adverse effect of: being assigned only to her district; experiencing "multiple changes in a variety of responsibilities"; being excluded from positions like the field training officer's position; and the "needs improvement" rating on one aspect of her evaluation.

An adverse employment action generally must be " 'a materially adverse change in the terms of . . . employment,' such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *McGinnis*, 266 F.Supp.2d at 762 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996)); *see also, Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Bowman*, 220 F.3d at 461 (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). De minimis employment actions are not actionable. *Bowman*, 220 F.3d at 462.

The Sixth Circuit has held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987)).  However, an adverse employment action does not have to constitute an "ultimate employment decision."  *See Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004).  In addition, the Sixth Circuit has noted that relocation or increased commuting time may be factors to consider in determining whether a reassignment constitutes an adverse employment action.  *See Keeton v. Flying J, Inc.*, 429 F.3d 259, 264-65 (6th Cir. 2006) (finding that jury could reasonably conclude that transfer which increased commute time so that plaintiff needed to consider relocating constituted adverse employment action).

Although DNR transferred Miller without a change in her salary, work hours, or title, and it asserts that the transfer was not disciplinary, DNR's decision would require Miller and her husband to contemplate relocation.  DNR knew that Miller's husband worked for DNR in the same area in which Miller worked.  Based on these unique circumstances, the Court concludes that Miller's reassignment to a new district constituted an adverse employment action for purposes of establishing her prima facie case of discrimination.

However, Miller has not demonstrated the fourth prong of her prima facie case, that a similarly situated individual was treated differently.  The Sixth Circuit has held that:

> to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  Miller bears the burden of demonstrating

that her behavior is of "comparable seriousness" to a comparator. *See Mitchell*, 964 F.2d at 583 n.5.  Miller fails to do so here.

Miller asserts that she is similarly situated to Sergeant Craig Grey who worked in a different district from Miller.  Miller presents evidence that Grey was a supervisor in another district and had conflicts with his subordinates.  [Court Doc. No. 28-5].  The evidence suggests that Sgt. Grey has a "foul mouth" and "has on occasion lost his temper." *Id.*  His subordinates described him as a bully who created an intimidating and offensive environment. *Id.*  Grey makes an inappropriate comparator for several reasons.  Miller does not demonstrate that Grey had the same supervisor as Miller did or that he was subject to the same standards.  Further, although both Miller and Grey may have engaged in inappropriate conduct towards co-workers, Miller does not demonstrate that Grey engaged in conduct comparable to Miller's false allegation against a Michigan State Police Officer.  Thus, Miller and Grey are not similarly situated. *See Ercegovich*, 154 F.3d at 352.  Miller, therefore, fails to demonstrate a prima facie case of disparate treatment discrimination based on her transfer.

Even if Miller satisfied her prima facie burden, this Court concludes that DNR has demonstrated a legitimate nondiscriminatory reason for the transfer and that Miller has failed to demonstrate this reason was a pretext.  DNR's collective bargaining agreement with its employees allowed DNR to transfer employees whose "continued presence in a work site will be detrimental to the continued effectiveness of the work unit or, the employee will be seriously hampered in the effective performance of the employee's duties." [Court Doc. No. 19-20].  Miller's alienation of both the Naubinway staff and the local Michigan State Police Department indicate that Miller's effectiveness was diminished in her current location.  Further, it is

undisputed that Miller made a false report against a Michigan State Trooper, and it is undisputed that the Naubinway staff initiated contact with their managers to discuss "issues" the entire staff was having with Miller.

Miller asserts that Bacon's comments and the unfairness of the investigation into her interactions with the Naubinway staff help to establish pretext. This Court disagrees. Although DNR's investigation into the allegations against Miller by Naubinway staff may not have been the most thorough or exemplary investigation, courts do not second-guess an employer's business decisions. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *E.E.O.C. v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999); *Garrison v. Gambro, Inc.*, 428 F.3d 933, 938 (10th Cir. 2005); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991); *Bush v. American Honda Motor Co.*, 227 F.Supp.2d 780, 797 (S.D. Ohio 2002) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002)). Further, although Miller may be correct that not all of the allegations against her were fair or represented an accurate depiction of the full story, she does not dispute that several different employees expressed different concerns with her behavior. *See* Vallier Dep., p.8; Ozanich Dep., pp. 8-9; Rodock Dep., pp. 6-12; Douglass Dep., pp. 7-12. Thus, DNR was not unreasonable in concluding that her effectiveness in working with several members of the Naubinway staff had diminished. In addition, Bacon's comments about Miller being manipulative reflect more of his opinion of Miller than his intent to discriminate against her based on her sex. For these reasons, Miller's claim of disparate treatment discrimination on the basis of her transfer must fail.

Miller also claims that other actions by DNR constitute disparate treatment discrimination.  These alleged actions include: confining her to working within her area; "multiple changes in a variety of responsibilities"; exclusion from positions like the field training officer's position; and a "needs improvement" rating on her employment evaluation.  It is unclear to the Court what "multiple changes in a variety of responsibilities" Miller is alleging as evidence of disparate treatment.  Miller also fails to demonstrate that similarly situated male co-workers were not subject to the same changes in responsibilities.  The fact that a position has changes in responsibilities over a period of many years is not surprising, nor does it demonstrate discrimination on the basis of sex.  Miller's allegation that she was excluded from a field training officer's position after allegedly requesting it also does not constitute an adverse action because Miller demonstrates no evidence that she applied for such a position.  *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004) (noting that a "specific application" is required in a failure to promote case rather than a general request for promotion)(citing *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)).   Nor does she present evidence, beyond her own speculation, of her qualifications for the position as compared to the relative qualifications of her male co-workers.  DNR presents evidence that Miller never discussed her interest in the field officer's position with her supervisor, Polzien.  [Court Doc. No. 19-13, Polzien Dep., p. 59].  Miller's one "needs improvement" rating on an otherwise satisfactory employment evaluation also does not rise to the level of an adverse employment action.  A low employment rating on an otherwise satisfactory evaluation is not considered an adverse employment action under Title VII.  "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism

or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.

1999).  Miller's one remaining allegation, that she was confined to work in her area, is not

enough to rise to the level of an adverse employment action.  *See Bowman*, 220 F.3d at 461.

Even when considering these allegations combined, the Court concludes that they do not rise to

the level of an adverse employment action sufficient to state a prima facie case of disparate

treatment discrimination.

Although Miller fails to address this issue in her opposition to summary judgment, it

appears that she may be raising a claim of a discriminatory failure to promote her to the position

of sergeant.  In a failure to promote case, the plaintiff must demonstrate: (1) membership in the

protected class; (2) she applied for and was qualified for an open position; (3) she was considered

for the position and was rejected; and (4) that other employees outside of the protected class with

similar qualifications were promoted at the time that the plaintiff's request for promotion was

refused.  *See McGinnis*, 266 F.Supp.2d at 768.  For purposes of the fourth prong of the prima

facie case, the plaintiff must show that other individuals were similarly situated in "all relevant

respects."  *Donahoo v. Ohio Dep't of Youth Services*, 237 F.Supp.2d 844, 867 (N.D. Ohio 2002)

(quoting *Evans v. Toys R Us Ohio, Inc.*, 221 F.3d 1334, 2000 WL 761803 *9 (6th Cir. 2000)).

Federal courts have found that a plaintiff has failed to establish pretext where the plaintiff fails to

provide the court with any evidence about the qualifications of the individuals who were

promoted.  *See e.g.*, *Franklin-Gavin v. Autozone, Inc.*, 366 F.Supp.2d 619, 624-25 (W.D. Tenn.

2005).

The Court concludes that Miller fails to demonstrate the second and fourth prongs of her

prima facie case on her failure to promote claim.  DNR presents evidence that the employee

-24-

selected for the position, David Rantanen, was more highly-qualified for the sergeant position than Miller.  *See* [Court Doc. No. 19-17, Thomas Aff., Att.].  The interview committee determined that Rantanen was more qualified in the areas of leadership, communication, knowledge of programs, and team building-conflict resolution.  *Id.*  The interview committee determined that Miller was "not an acceptable candidate" and that if Rantanen declined the position, DNR would not fill the position.  *Id.*  The team concluded that "[d]uring her interview [Miller] was unable to demonstrate the skills and abilities necessary to fulfill the responsibilities of this position."  *Id.*

Although the Sixth Circuit has warned district courts not to conflate the prima facie case with the employer's legitimate nondiscriminatory reason for taking the adverse employment action, Miller has not shown any evidence beyond her own speculative deposition testimony that she was qualified for the position of sergeant.  *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000).  In addition, Miller fails to demonstrate any evidence beyond her own speculation in her deposition about Rantanen's qualifications.  The self-assessment of the plaintiff is not relevant and "unsupported speculation is insufficient" to demonstrate superior qualifications.  *See Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996).  Therefore, the Court concludes that Miller's claim of failure to promote to the position of sergeant must fail.

### D.    Retaliation

Title VII prohibits discrimination against employees who attempt to protest or correct allegedly discriminatory employment conditions.  *See* 42 U.S.C. § 2000e-3(a).  To state a prima facie claim of retaliation, a plaintiff must demonstrate that: "1) she engaged in protected activity;

2) her employer knew of the protected activity; 3) the employer took an 'adverse employment action' against the plaintiff; and 4) a causal connection exists 'between the protected activity and the adverse employment action.'" *McGinness*, 266 F.Supp. at 773 (quoting *Hafford v. Seidner*, 183 F.3d at 515).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the actions. *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). Once the employer states a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that the protected activity was a "significant factor" in the adverse decision. *See Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989).

This Court recognizes that the U.S. Supreme Court recently granted certiorari, but has not yet issued an opinion, regarding what constitutes an adverse action for purposes of a retaliation claim under Title VII. *See White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789 (6th Cir. 2004), *cert. granted in part*, 126 S.Ct. 797, 163 L.Ed.2d 626 (2005). The Court is expected to issue a decision soon to resolve a current Circuit Court split regarding what type of adverse action is necessary to state a claim under Title VII.

In *White* the Sixth Circuit held that, like an adverse action in a disparate treatment discrimination claim, an adverse action for purposes of retaliation must be a "materially adverse change in the terms of [plaintiff's] employment." *Id.* at 797-99 (quoting *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d at 885). The Court concluded that the definition of adverse employment action for purposes of a discrimination claim and a retaliation claim should be the same. *White*, 364 F.3d at 799. In *White* the Court held that a suspension without pay followed by

-26-

reinstatement and backpay and a reassignment to a job with less prestige but comparable pay constituted adverse actions. *Id.* at 802. The Sixth Circuit has also held that, in the retaliation context, a lowered evaluation rating may not satisfy the adverse employment action of the prima facie case for retaliation. *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). In *Hollins* the Court held that "[s]atisfactory ratings in an overall evaluation, will not constitute an adverse employment action where the employee receives a merit raise." *Id.* at 662.

In cases in which a causal connection is established by temporal proximity alone, the temporal proximity between the employer's knowledge of the protected action and the adverse action must be "'very close.'" *Id.* at 873 (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). The Sixth Circuit has held that:

> A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.

*Nguyen*, 229 F.3d at 566 (quoting *Parnell v. West*, 1997 WL 271751, *2 (6th Cir. 1997)). Further, a passage of time of more than seven months may not support an inference of a causal link. *Nguyen*, 229 F.3d at 566-67. To establish a causal connection, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Id.* at 563.

The parties agree that Miller has demonstrated the first two prongs of her prima facie case of retaliation. Miller alleges that the decisions to suspend and transfer her, as well as the overall "needs improvement" rating on her employment evaluation were all adverse employment actions. As this Court has discussed *supra*, DNR's decision to transfer Miller constitutes an adverse

employment action.  In addition, the suspension without pay for five days also constitutes an adverse employment action under the Sixth Circuit's decision in *White*.  *See* 364 F.3d at 802. With respect to the "Needs Improvement" evaluation, Miller did not receive overall satisfactory ratings with a merit pay increase, unlike the plaintiff in *Hollins*.  *See* 188 F.3d at 662.  Miller received an overall "Needs Improvement" rating with a restriction on pay increases until she demonstrated a higher evaluation rating.  [Court Doc. Nos. 28-15, 28-17].  This Court thus finds that Miller's evaluation of overall "needs improvement" with restrictions on pay increases satisfies the definition of adverse action set forth in *White* and is distinguishable from the employment evaluation in *Hollins*.  364 F.3d at 797-99; 188 F.3d at 662.

However, this Court finds that Miller fails to establish the fourth prong of her prima facie case of retaliation.  Miller filed her first charge of discrimination on June 29, 2002 and her second charge of retaliation discrimination on March 31, 2003.  Plaintiff's incident with the Michigan State Police Department occurred in September of 2003, and the Naubinway staff contacted management with concerns in October 2003.  Miller received discipline for the incident in March, 2004, and DNR transferred her to a different district effective April 11, 2004. Thus, Miller's last charge of discrimination in March 2003 was about a year before any of the alleged retaliatory actions.  Further, Miller does not dispute the fact that, in the intervening months between her charge and the adverse actions, she made a false report to the Michigan State Police, the act for which she received a five-day suspension.  Nor does she dispute that the Naubinway staff initiated contact with management in October 2003 to discuss multiple issues that several different employees were having with Miller.  Miller presents no evidence that other

appropriate comparator employees committed similar offenses but were not suspended or transferred. For the reasons stated *supra*, Sgt. Grey is not an appropriate comparator.

Miller asserts that DNR's imperfect investigation into the Naubinway staff allegations, coupled with DNR's knowledge of her EEOC complaints establishes the causation prong of her prima facie case. The Court disagrees. Even if it did not obtain Miller's complete side of the story, as discussed *supra*, DNR had reason to believe that Miller's effectiveness in her position had diminished due to the feelings of multiple Naubinway staff members. The complete truth or falsity of their allegations was not at issue; rather Miller's continued ability to work compatibly with those staff members was the issue.

Even if Miller had demonstrated a prima facie case, she has not refuted DNR's legitimate nondiscriminatory reasons for its action. The parties do not dispute that Miller made the false report against a police officer, nor do they dispute that Naubinway staff members complained about Miller. These actions led to Miller's "needs improvement" rating, and all of the adverse employment actions occurred much closer in time to the false report and the complaints than to Miller's EEOC charges. Again, Miller points to DNR's imperfect investigation as evidence that retaliatory motives played a significant role in the adverse actions taken against her. However, Miller offers no evidence for this theory other than her belief that the investigation was unfair. Evidence of an unfair investigation does not demonstrate retaliatory animus. As stated *supra*, the Court does not second-guess the business decisions of an employer. Miller's retaliation claim must, therefore, be dismissed.

**E.      Constructive Discharge**

-29-

Although neither party briefs the issue, Miller's complaint raises a claim of constructive discharge. To establish a prima facie case of constructive discharge, a plaintiff must demonstrate that "1) 'the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit.'" *Logan v. Denny's Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (citing *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). A plaintiff "must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." *Moore*, 171 F.3d at 1080. Since Miller has failed to demonstrate a Title VII violation, she similarly fails to demonstrate her claim for constructive discharge. Therefore, her constructive discharge claim will be dismissed.

## IV.   Conclusion

After reviewing the record and the applicable law, the Court concludes that no genuine issue of material fact exists regarding plaintiff Miller's claims against the defendant DNR under Title VII. Therefore defendant's motion for summary judgment on plaintiff's Title VII claims will be **GRANTED**. Plaintiff's Title VII claims will be **DISMISSED WITH PREJUDICE**.

A separate judgment will enter.


Dated:  *April 24, 2006*            _/s/ R. Allan Edgar_____
                                    R. ALLAN EDGAR
                                    UNITED STATES DISTRICT JUDGE